954 F.2d 733
 NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
MORTON MANAGEMENT, INC., Petitioner,
v.
UNITED STATES, Respondent.
 No. 90-1330.
 United States Court of Appeals, Federal Circuit.
 Jan. 14, 1992.
 
 Before NIES, Chief Judge, and PAULINE NEWMAN and CLEVENGER, Circuit Judges.
 DECISION
 NIES, Chief Judge.
 
 
 1
 Morton Management, Inc. (MMI) appeals the decision of the General Services Administration Board of Contract Appeals (Board). The Board denied MMI's protest holding that the Department of Health and Human Services' (HHS's) solicitation was not ambiguous or vague and that the solicitation provided sufficient information for offerors to formulate a bid. We affirm.
 
 DISCUSSION
 
 2
 The HHS issued a request for proposals, RFP 263-88-P(86)-0256 (RFP or solicitation), for a microcomputer local area network (LAN), for the Office of the Director of the National Institutes of Health. The RFP was for a firm fixed price contract with an initial term of one year, with four one-year renewal options. The solicitation required the provision of the equipment, software, maintenance and other support services required to install and use the network.
 
 
 3
 A LAN is a configuration of interconnected microcomputers that can send data to each other, among other applications. A LAN is generally comprised of numerous personal computers connected by cable to one or more larger microcomputers called "file servers." The file servers act as office administrators, route messages, queue documents for printing, and store files shared by all users.
 
 
 4
 After the RFP issued, several offerors submitted questions to the contracting officer (CO) seeking clarification of various requirements in the solicitation. MMI did not submit any requests for clarification. The CO responded on August 22 and 24 by sending all interested parties, including MMI, a list of the submitted questions along with HHS's clarifications. On August 31, 1988, HHS received eight timely proposals from other prospective vendors, but not from MMI. Instead, MMI submitted a protest letter to HHS alleging that the solicitation contained ambiguities and omissions that prevented MMI's formulation of a proposal.
 
 
 5
 After HHS denied MMI's protest, MMI filed the protest with the General Service Board of Contract Appeals. After resolving a procedural matter in MMI's favor, the Board denied MMI's protest on the merits. The Board concluded that "a review of the specifications, and the testimony provided by respondent's witnesses ... demonstrates (sic) that a knowledgeable offeror should have been able to work with these specifications to determine the Government's functional needs and to formulate an offer." MMI appeals the Board's decision seeking to have the award set aside, the HHS contract resolicited, and an award of fees and costs for its protest.
 
 AMBIGUITY
 
 6
 MMI's protest is based on allegedly ambiguous provisions in the HHS solicitation which prevented MMI from competing on an equal basis with the other offerors. Negotiated procurements, however, balance technical merit and price and thus, by definition, this type of solicitation engenders different technical approaches to meeting the Government's requirements. MMI, nevertheless, argues that the requirements of the solicitation are too broadly drawn to permit effective competition.
 
 
 7
 Specifically, MMI's vice president testified that without knowing what type of communications link existed between buildings 1 and 31 (e.g., telephone line, coaxial or fiber optic cable, video network, satellite link), it was impossible for MMI to propose equipment to implement the LAN. Essentially, MMI argues that Section C.2.8 is ambiguous because it failed to state the type of medium used to connect the two buildings.
 
 
 8
 The CO testified that, when the RFP issued, there was no communications link between the buildings. Since no communications link existed, the solicitation did not indicate the type of medium to be used but left that to the offeror to propose. The only stated requirement for the link was that the equipment be capable of transmitting at 9600 bits per second. This is a relatively slow transmission speed which can be satisfied by a telephone line.
 
 
 9
 The Board found that although no particular medium was specified, "the Government has demonstrated that no particular medium is required" and that "an offeror that wished to be price competitive would choose to offer a telephone line." We are unpersuaded of legal or factual error in the Board's conclusion.
 
 
 10
 Next, MMI argues that the requirements for a file backup and recovery facilities are fatally vague and ambiguous because the Government fails to define specific terms within the requirement which are necessary for the offeror to bid intelligently.
 
 
 11
 The Board found that the terms "unattended" and "scheduled" have specific, regularly accepted meanings in the automatic data processing industry. "Unattended" means a person need not be present during backup; "scheduled" means that the Government wants the capability to determine when backup will take place. The Board also found that it was unnecessary for the RFP to precisely define the terms "slow" and "cumbersome" because any system which managed to accomplish file backup would meet the mandatory requirements and be eligible for further consideration. We uphold the Board's findings and interpretations in these respects.
 
 
 12
 Additionally, MMI asserts that the solicitation set forth ambiguous quantity requirements. MMI argues that no reference is given to maximums in the solicitation and that there is confusion as to delivery of amounts and timing.
 
 
 13
 The Government counters that since this case involves a negotiated procurement, the solicitation's purpose was to elicit a range of proposed solutions, not to restrict offerors to a narrow, pre-conceived proposal format. The offerors in a negotiated procurement are not expected to all offer precisely the same service in precisely the same manner.
 
 
 14
 The Board found that "[a] review of the solicitation itself, as qualified by the question and answers provided to vendors, and the testimony offered at the hearing, demonstrates that prospective offerors were adequately apprised of the agency's preferred delivery schedule and quantities contemplated to be purchased." In sum, the Board determined that the specifications at issue were functional rather than performance specifications, and as such merely described the Government's need, not the manner in which the need was to be fulfilled.
 
 
 15
 In a negotiated procurement, the contracting officer is permitted and encouraged to conduct oral or written discussions with offerors whose proposals vary from the RFP. The negotiation process permits discussion between the parties and modifications of proposals by offerors. MMI did not take advantage of or participate in the negotiation process. MMI neither submitted questions concerning the solicitation's requirements before the proposal deadline as other offerors, nor did MMI submit a proposal.
 
 
 16
 The Government described the result it sought and provided enough flexibility for the offerors to use their expertise in designing a system to meet the Government's articulated goals. Under the circumstances presented here, forcing the Government to define its requirements precisely, i.e., to include the type of transmission medium, would deny the Government the broad expertise and innovative spirit which an offeror-generated solution could bring to the project. We agree that no greater precision in the specifications was required in this particular negotiated procurement.
 
 
 17
 Finally, MMI's allegations concerning hidden capacity requirements for section C.2.16 are unsupported by record evidence. The RFP clearly states a minimum and, while a maximum was not stated, the Board found that it should have been evident that the offerors were expected to bid in accordance with the planned growth rate.
 
 EVALUATION OF OFFERS
 
 18
 MMI also argues the Board failed to recognize that HHS used undisclosed, unexpressed performance requirements to interpret the solicitation's specifications and to evaluate the offers. Per MMI, the secret performance requirements render the solicitation fatally ambiguous and vague because the potential offerors could not effectively compete when the standards by which they would be measured could not be known. MMI presented evidence that the alleged undisclosed performance requirements were used to eliminate "offeror H" from the competition improperly.
 
 
 19
 The Government asserts that MMI has no standing to protest the performance requirements used to evaluate the offers of others. The Government argues that because MMI did not submit a bid, it is not an "interested party" for Brooks Act purposes. 40 U.S.C. § 759(f)(9)(B). We agree and hold that MMI lacks standing to raise this issue, see generally Allen v. Wright, 468 U.S. 737 (1984) and cases cited therein. MMI has suffered no "injury fairly traceable to the [Government's] allegedly unlawful conduct." Id. at 750-51.